**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| CUTTING EDGE TECHNOLOGIES, L.L.C. | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. |
| v. | ) | 3:05cv671 HLA-HTS |
| | ) | |
| NORTH FLORIDA SHIPYARDS, INC. | ) | |
| and | ) | |
| BERMAN BROS., INC. | ) | |
| Defendants | ) | |
| | ) | |

PLAINTIFF'S  OPPOSITION  TO
DEFENDANT'S  MOTION  FOR  SANCTIONS

Defendant's Motion for Sanctions fails to set forth any basis for sanctions.  Defendant's primary concern in its motion appears to be based upon its belief that discovery has been insufficient.   However, there are not a great deal of documents nor a significant amount of evidence in this case.  Document discovery may be minimal but it is complete.

The facts in this case are straight forward and simple and have been clearly set forth in Plaintiff's full and complete responses to Defendant's interrogatories.  The inventor of the patent in suit, Mr. William Buck Sykes, demonstrated his patented method to Berman Bros. in 1999. Mr. Sykes, his brother Mr. Thomas Sykes, and Plaintiff's president, Mr. Matthew Pasulka, later (on separate occasions) observed personnel at Berman Bros. using the patented method. Berman Bros. was asked to pay a patent license fee.  When Berman Bros. was unwilling to stop using the Sykes method, and unwilling to pay a license, undersigned counsel was engaged to bring suit to enforce the patent.  These facts are set forth in greater detail in the second portion of Plaintiff's answer to Interrogatory 1, below:

> . . . . . Mr William Sykes conducted a demonstration on or
> about August 10, 1999 at Berman Bros. in Jacksonville, Florida.
> Several personnel from Berman Bros. attended this demonstration

and learned of the advantages of the Sykes method for steel cutting.   The Confidential Disclosure Agreement (C00012) signed by Peter L. Kurfehuich the VP of Operations at Berman Bros. is related to this demonstration.  Also present at this demonstration was Mr. Wallace Mazell of PraxAir.   Again in 2001, Mr. Sykes met with the V.P. of Berman Bros. to discuss the cutting of railroad cars for the Florida Railway using the Sykes technique.  Mr. Sykes visited the site of the rail car cutting and observed the equipment being used.  Mr. Sykes also evaluated the man hours used to cut each rail car.

Mr. William Strate, of Strate Welding was also familiar with the Sykes method and the cutting practices of Berman Bros. in 1999-2000.

In 2001-2002, while working for Geogia Pacific, Mr. Williams Sykes brother, Mr. Thomas Sykes, who was knowledgeable of the Sykes technique,  was aware of activity at the Berman Bros. facility.

Mr. Matthew Pasulka observed cutting performed by personnel at Berman Bros. in the manner as described above, on or about February 17, 2004 and again on March 3, 2006.   On both of these occasions, the cutting was performed by all burners employed by Berman burning on that day (4 observed) during the first visit (approx 2 hours).  During the second visit, steel cutting at Berman Bros. using the Sykes method was again observed, as before, all burners employed during visit used the Sykes method and the visit lasted approximately 30 min.  The patented process was demonstrated by the foreman who informed Mr. Pasulka that burning with higher pressure was the best way to do it.  Mr. Pasulka also observed cut steel in a pile.  The steel in the pile clearly exhibited having been cut with multiple infringing cuts.  Mr. Pasulka purchased and is still in possession of a piece of steel cut at Berman Bros., by a Berman Bros. employee on February 17, 2004.   The following documents are related to these occurrences:

Berman Bros. began practicing the Sykes technique taught in the '144 patent at least as early as August 10, 1999and presently continues to use this method.

The facts are that simple.  They have been known by the parties long before suit was filed.  The partes have known each other and even worked together for the past 7 years.  The method is easily observable and quickly recognizable by anyone familiar with the patented

Sykes technique.  There are no complicated, highly technical devices and no in depth reverse engineering analysis performed by teams of consultants.

A standard "prior art ' cut is made by holding a torch perpendicular to the surface of the steel, with a low gas pressure and the steel is expelled from the cut on the opposite side of the plate.



- prior art supplied by Defendant -

When someone is using the patented Sykes method, the torch is held at a angle, the gas pressure is increased and the steel slag is expelled from the cut area on the same side of the plate as the torch.





- Figure 3C from the patent in suit -                    - Picture of Cutting at Berman Bros. -

Plaintiff's answer to interrogatory 1 also provides a description of what Mr. William Sykes, Mr. Thomas Sykes and Mr. Pasulka observed at Berman Bros. There is no other way to describe the method of cutting observed and no greater detail to the process, then as set forth in the first portion of the interrogatory answer as reproduced below:

Berman Bros. cuts scrap steel using the method taught by Mr. Sykes as described and claimed in the '144 patent in suit.

Specifically, in order to achieve a faster cut, personnel at Berman Bros. cut steel holding the tip of a cutting torch at an angle, as opposed to an alternative practice of holding the torch perpendicular to the surface of the steel being cut. By holding the tip at an angle, as taught by William Sykes, the cutter can form of a trench in front of the cut. The trench is formed on the same side of the steel, such that the molten steel is substantially expelled from the plate on the same side of the plate as the cutter. By using this method, the cutter is able to achieve a significant increase in cutting speed. The cutter maintains the speed of the cut by adjusting the cut angle, gas pressure or distance between the torch and the steel.

More specifically, employees at Berman Bros practice a method for cutting metal, comprising:

heating metal locally to a molten state by holding a cutting torch generally perpendicular to the surface where the cutting torch has a two-part tip which releases both a combustible gas and a combustion enhancing gas and generally in the same direction and has a control means for gradually changing gas pressures;

directing the gases at the molten metal at an angle of incidence with a horizontal plane of the molten metal of at least about 45 degrees and increasing the flow rate of the combustion enhancing gas thereby removing the molten metal from the local area creating a cutting trench;

maintaining an angle of incidence of at least about 45 degrees to remove the molten metal from the cutting trench so that the molten metal exits the cutting trench in the same direction as the angle of reflection away from the operator, but on the same side

of the plane of the metal on which the cutting torch is located;

moving the cutting torch in a direction generally parallel to a desired cut line to expand the cut line; and

varying at least one of the distance from the cutting tip to the metal and the flow rate of the oxygen so as to provide heat making a cut.

Cutters at Berman Bros. use  propane adjusted between about 35 to 80 psi. and oxygen adjusted between about 150 and 220 psi.

Mr. Sykes and Mr. Pasulka also provided the same description to Plaintiff's expert, Dr. David Dickinson, detailing what they each have observed.  Plaintiff's expert Dr. Dickinson agreed that on the basis of the observations, assuming them to be accurate, the activities of the Berman Bros employees would infringe the patent in suit.  Mr. Dickinson, as stated in his timely submitted report, also looked at photos of cutting at Berman Bros, such as that shown above, and looked at the edges of the cut steel plate.  That is it.  That is all of the evidence at the time of the interrogatory answers and the expert report.  There is no guess work, no surprises no hidden evidence no secret witnesses and special analysis.

In the last week of July, 2006, a private investigator took video footage of cutting at Berman Bros.   This footage was reviewed by Dr. Dickinson on July 31st and will be discussed in his supplemental report this week.   This new evidence gathering was prompted by Defendant's assertion that no personnel at Berman Bros cut according to the Sykes method. The recent video demonstrates otherwise.

 

- 5 -

All of this evidence, including the recent video footage has been timely produced to Defendant's counsel.  Defendants counsel has (i) over six hundred pages of documents, (ii) two CD's filled with photographs, and (iii) four video tapes of cutting produced by Plaintiff.  In stark contrast, to date, Plaintiff has not received a single piece of paper from Defendant's records.

Defendant has all of the discovery it has sought, and more.  There is no basis for discovery sanctions against Plaintiff or Plaintiff's counsel.  The discovery has been produced as agreed and in its entirety,  This is a small discovery case, with most if the evidence in the form of eye witness testimony, which, as Plaintiff's counsel has stated, Defendant will have to acquire through deposition testimony.

Plaintiff's counsel has always acted in a professional and cooperative manner and did not fail in any discovery obligations and never disregard the Court's Order of July 11.


## RESPONSE  TO  DEFENDANT'S  FACTUAL  SUMMARY

Defendant's "factual summary" omits some very important facts.

Defendant's Motion discusses a few recent weeks and cites only to discovery documents ans pleadings filed with the Court.  Defendant's counsel omits  informal communications, e-mails, letters and telephone conversations in what has been two year long interaction between counsel. Perhaps most important, Defendant's "factual summary" completely omits the settlement discussions and settlement meetings which overlapped with the due dates for discovery and based upon which, the parties agreed to delay discovery responses.

In July of 2004, Plaintiff's counsel sent a notice letter to Berman Bros (EXA).  In

August of 3004, Defendant Berman Bros responded that they believed that they did not need a license. Plaintiff's counsel attempted to arrange a meeting between the parties to discuss the issue and work toward resolution. No meeting was held..

Shortly after filing suit, Plaintiff's counsel, in May of 2005, attempted to arrange a meeting so that the parties could discuss the merits of the case and examine each other's positions in the hope of arriving at a mutually beneficial resolution and avoid the expense of litigation.  (Exhibit B)  Undersigned counsel contacted Defendant's counsel on several occasions in the fall of 2005 and agin in January of 2006 to attempt to address the issues of non-infringement and validity raised in Defendant counsel response. Defendant's counsel ignored Plaintiff's counsel's repeated requests for a meeting for over seven months.

Plaintiff's counsel stressed that, due to two trials in March and April, the meeting woul have to occur before the end of January, 2006.  A meeting was finally arranged in March 20005, unfortunately, by the time Defendant's counsel agreed to meet, undersigned counsel could not attend.  Associate counsel and Plaintiff's president met with Defendant and due to a lack of candor, nothing came of the meeting.

Undersigned counsel and Defendant's counsel were finally able to meet at the facilities of ex-codefendant North Florida Shipyards (NSF) in early May, before the original due date for discovery responses.  Plaintiff's counsel not only personally provided the most significant evident, the video tapes of cutting by Defendants, but also personally reviewed and explained the tapes with Defendant's representative and Defendant's counsel, weeks before any production was due.   Plaintiff's counsel also requested a tour of the facility of NFS.  Despite the protests of Defendant's counsel, Defendant's representative agreed to the tour, stating they had nothing

to hide.  An impromptu, hoc tour of the shipyard facility and of two ships in for refitting was conducted.  Again, despite the protests of Defendant's counsel, Undersigned counsel was able to inspect the cutting on two ships and to speak directly with NSF employees performing cutting.  Both of these activities were not allowed by counsel at the March meeting.  Based upon this open disclosure, it became apparent that the Plaintiff and NFS would be able to set aside their dispute, and an agreement was reached to hold off on discovery for a short time.

The parties engaged in settlement discussions and Plaintiff sent a settlement proposal to Defendant's counsel on May 17.  (EX C)   Discovery responses were due the 24th, but had been postponed by agreement.   Instead of responding with a counter proposal, Defendant's counsel sent two contradictory e-mails on June 2nd.  One e-mail insisting that the litigation go forward despite the agreed settlement.  The other complaining that too much money had been spent on litigation. (EX D)   Plaintiff's counsel was confused by these e-mails.  Plaintiff's counsel was then shocked by the filing of a motion to compel on June 6, when the parties had already reached settlement (the terms of which were highly favorable to NSF) and had agreed to postpone the discovery until a resolution with Berman Bros is finalized.  Plaintiff's counsel expressed his surprise at the June 6 motion to compel and stated his understanding that it would be withdrawn.

Plaintiff's counsel responded to the two June 2 e-mails by letter of June 10, (EX E).  Defendant's counsel accepted the settlement immediately after this letter and settlement with NFS was entered on June 14.  Plaintiff's counsel believed at the time and continues to believe that Defendant's counsel had a significant,  and undisclosed, conflict of interest between its two clients but choose to allow Defendant's counsel to resolve this conflict, without Court

intervention.

Based upon the resolution with NSF, Plaintiff's counsel held out strong hope that Berman Bros. could also reach settlement and discussions were continued in June.  Plaintiff's counsel did not respond to the motion to compel because he believed that this issue had been resolved. When settlement was not reached, Plaintiff provided full and complete responses on July 13.  Immediately after receiving Defendant's counsel's request for clarification on July 17, Plaintiff's counsel responded with a comprehensive response on July 18.

Despite the understandings, (and apparent misunderstandings) between counsel, Defendant pressed its motion to compel.  In a similar fashion, despite Plaintiff counsel's agreement in writing to the fees **exactly** as submitted by Defendant's counsel, Defendant's counsel has moved again for Court intervention where none is needed.  Defendant's counsel moved for a Court Order (Dkt 27) to determine the amount of fees when there has never been any dispute as to the amount of fees requested.  Defendant's counsel continues to look for a fight where there is none.

Plaintiff's counsel has acted in a professional manner, honoring agreements and avoiding Court involvement in disputes that do not exist, Defendant's counsel has not.

It is very telling that Defendant's "factual summary" completely omits the facts most relevant to this matter.


## RESPONSE  TO  SPECIFIC  ISSUES RAISED  BY  DEFENDANT


I - Documents:

Plaintiff produced all of the documents in its possession, instead of a written response promising documents or refusing production.  Plaintiff will provide a written response to Defendant on August 14, stating that all documents have been produced.

The cooperation of Plaintiff should be sharply contrasted with that of Defendant who, instead of producing documents, or even reviewing documents simply stated it would allow Plaintiff's counsel to search through dozens of disorganized and irrelevant boxes of documents in Defendant's attic which had not been reviewed or organized in response to Plaintiff's requests.  Yet Plaintiff's counsel has not complained.


II. - Interrogatories:

It appears that Defendant's counsels greatest concern about the interrogatory responses relates to the signature block.  However, the interrogatories are verified by Plaintiff's president, Matthew Pasulka who is also an attorney, and the original signature was provided to Defendant's counsel.  Although the exact form it does not appear to comply with Defendant counsel's idea of the requirements of FRCP 33, this form has been used by Plaintiff's counsel and other counsel for over twenty years and in over 75 litigations without complaint.  Plaintiff has no intention of disowning any of these answers and has never indicated any intention to do so.  Defendant's concerns are again not warranted.

With respect to the completeness of the responses, Plaintiff answers are complete and proper.  There is no withheld or missing information.  The only additional information is in the possession of witnesses, as stated above and will need to be obtained by depositions, which are currently scheduled.  Again, Plaintiff's counsel does not understand the nature of Defendant's

counsel's complaints.


III.     - Conduct of Counsel

Plaintiff's counsel is confused by most of this section of Defendant's motion.  For example Defendant's counsel states that undersigned counsel refused to agree to fees and cites our agreement to fees ". . .to avoid unnecessary disputes and time wasting, we will agree to deduct this amount. . ."  This is not a statement in dispute, it is an agreement to pay the fee amount exactly as submitted by Defendant's counsel.

Defendant's counsel attempted to make the scheduling of deposition reporters difficult by providing conflicting information to Plaintiff's lead counsel and Plaintiff's local counsel. When Plaintiff's counsel attempted to resolve this conflict, Defendant's counsel could not be found by telephone.   The fact that Plaintiff's counsel may have expressed his frustration and the game playing of Defendant's counsel in a telephone message, is hardly cause for judicial intervention.

Instead of receiving documents which had been gathered, reviewed, copied and produced, Plaintiff received a written response which invited counsel to cull through dozens of boxes in storage at Defendant's place of business the day before depositions were to start.   It was unlikely that any copies would be available at the time of depositions.  Therefore the depositions had to be rescheduled, due again to the gamesmanship of Defendant's counsel.


IV, V and VI - SANCTIONS

None of the sanctions proposed by Defendant's counsel are warranted, even if all of Defendants baseless accusations were true.

There remains sufficient time to complete discovery, in fact, depositions are currently scheduled to end prior to the close of discovery and no additional document exchange is contemplated by either party. Expert reports will be supplemented next week, before deposition and before the mediation scheduled for August 22nd.

If Defendant needs additional discovery, Plaintiff has no objection, as long as any discovery extension is mutual. There is sufficient time to conduct additional discovery without any amendment to the remainder of the Court's schedule in this matter.

Plaintiff has not been deficient in any manner and the only proper remedy, if any is warranted, would be an extension of discovery.

Respectfully submitted,

Joseph J. Zito, 5640
Kendal M. Sheets, 44537
ZITO *tlp*
26005 Ridge Road, Suite 203
Damascus, Maryland 20872
(301) 601-5010
Fax (301) 576-3531


LINDELL FARSON & PINCKET,P.A.

/s/ Roger K. Gannam
J. Michael Lindell, Esquire
Florida Bar No. 262226
Roger K. Gannam
Florida Bar No. 240450
12276 San Jose Boulevard, Suite 126
Jacksonville, Florida 32223-8630
(904) 880-4000
(904) 880-4013 (facsimile
Attorneys for Plaintiff

- 12 -

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing has been furnished to **James W. Middleton, Esq.** and **Richard S. Vermut, Esq.** of Rogers Towers, P.A., 1301 Riverplace Boulevard, suite 1500, Jacksonville, Florida 32207, by notice of electronic filing, this <u>14th</u> day of August, 2006.

/s/ Roger K. Gannam
Attorney

ZITO *tlp*

A Technology Law Practice
26005 RIDGE ROAD, SUITE 203
DAMASCUS, MARYLAND 20872

www.zitotlp.com

Voice (301) 601-5010
Fax   (301) 482-0779

Washington, DC
Damascus, Maryland
Boca Raton, Florida

July 7, 2004

Mr. Matthew Self
President
North Florida Shipyards
P.O. Box 3255
Jacksonville, Florida 32206

**VIA EXPRESS MAIL**

Re:  U.S. Patent No. 5,922,144 for Accelerated Steel Removal Process

Dear Mr. Self:

We are contacting you on behalf of our client, Cutting Edge Technologies, Inc., owner of U.S. Letters Patent 5,922,144 (the '144 patent) "Accelerated Steel Removal Process."

The '144 patent teaches a method for cutting steel at accelerated rates in which an operator uses high pressure propane and oxygen. It has come to our attention that your personnel at North Florida Shipyards use accelerated steel cutting techniques. After careful review of our information, we understand that steel cutting techniques used by North Florida Shipyards have been performed according to the teachings of the '144 patent and infringe at least claim 1 and/or claim 6 of the '144 patent.

Cutting Edge Technologies is interested in entering into a license agreement to allow your company to continue to use the teachings of the '144 patent. We encourage you to respond as soon as possible so that we may resolve this matter in a mutually beneficial manner. We have enclosed a copy of the '144 patent for your review.

Please contact me at your earliest convenience so that we can begin licensing discussions.

Sincerely,

Kendal M. Sheets

KMS/pc
Enclosure

ZITO *tlp*

A Technology Law Practice
26005 RIDGE ROAD, SUITE 203
DAMASCUS, MARYLAND 20872

www.zitotlp.com

Voice (301) 601-5010
Fax (301) 576-3531

Washington, DC
Damascus, Maryland
Boca Raton, Florida

May 2, 2005

Mr. Charles Berman
BERMAN BROTHERS, INC.
2500 Evergreen Avenue
Jacksonville, Florida 32206

   Re:  U.S. Patent No. 5,922,144 for Accelerated Steel Removal Process

Dear Mr. Berman:

   We are contacting you on behalf of our client, Cutting Edge Technologies, Inc., owner of
U.S. Letters Patent 5,922,144 (the '144 patent).  The "Accelerated Steel Removal Process" was
developed by William Sykes and is now the property of Cutting Edge Technologies, Inc.

   The '144 patent teaches a method for cutting steel at accelerated rates in which an
operator uses high pressure propane and oxygen.  It has come to our attention that your personnel
at Berman Brothers use accelerated steel cutting techniques.  After careful review of our
information, we understand that steel cutting techniques used by Berman Brothers have been
performed according to the teachings of the '144 patent and infringe at least claim 1 and/or claim
6 of the '144 patent.

   Cutting Edge Technologies is interested in entering into a license agreement to allow your
company to continue to use the teachings of the '144 patent.  We encourage you to respond as
soon as possible so that we may resolve this matter in a mutually beneficial manner.  We have
enclosed a copy of the '144 patent for your review.

   Please contact me at your earliest convenience so that we can begin licensing discussions.

           Sincerely,

           Kendal M. Sheets

KMS/pc
Enclosure

# ZITO *tlp*

A Technology Law Practice

26005 RIDGE ROAD, SUITE 203
DAMASCUS, MARYLAND 20872

www.zitotlp.com

Voice (301) 601-5010
Fax  (301) 482-0779

Washington, DC
Damascus, Maryland
Boca Raton, Florida

May 17, 2006

Mr. Richard S. Vermut
Mr. James Middleton
Rogers Towers, P.A.
1301 Riverplace Boulevard
Suite 1500
Jacksonville, Florida 32207

**VIA e-mail**

SUBJECT TO FRE 408 SETTLEMENT PURPOSES ONLY

Re:  Cutting Edge v. North Florida Shipyards
     3:05-cv-671-J-25HTS

Dear Rich and Jim:

Thank you for taking the time to discuss some of the outstanding discovery issues in this matter during my visit last week.   Also, thank you for providing a brief cutting demonstration and for allowing me to discuss the cutting issues in this matter with personnel from North Florida Shipyards.  I believe that the opportunity to jointly observe the cutting activities on two vessels in the shipyard was very helpful in arriving at a common understanding of the issues in this matter.

**Subject:** North Florida Shipyards
**From:** "Rich Vermut" <RVermut@rtlaw.com>
**Date:** Fri, 2 Jun 2006 09:00:34 -0400
**To:** "Kendal Sheets" <ken@zitotlp.com>, "Joseph J. Zito" <joe@zitotlp.com>
**CC:** "Jim Middleton" <JMiddleton@rtlaw.com>


Joe and Ken:

I have been speaking with NFS about your settlement offer.  They would
like to know why they should agree to permit your client to walk away
from the case now without a reimbursement of approximately $15,000 in
attorneys fees.  That is a very conservative estimate of the amount they
have spent since providing Kendal Sheets and Matt Pasulka with the
informal visit to their facilities in Jacksonville on March 3.  Earlier
this month, Joe Zito was not shown anything different than what was
previously demonstrated to Ken and Matt three months ago.
Unfortunately, they have been forced to incur those attorneys fees in
the interim.

Thanks,

Rich


Richard S. Vermut
Rogers Towers, P.A.
1301 Riverplace Boulevard
Suite 1500
Jacksonville, Florida 32207
(904) 346-5573
(904) 396-0663 (fax)
RVermut@rtlaw.com




TAX ADVICE DISCLOSURE: Pursuant to the requirements of Internal Revenue Service Circular
230, we advise you that any federal tax advice contained in this communication (including
any attachments) is not intended or written to be used, and cannot be used, for the
purpose of: (1) avoiding penalties that may be imposed under the Internal Revenue Code or
(2) promoting, marketing or recommending to another party any transaction or matter
addressed in this communication.

CONFIDENTIALITY NOTICE: The information and all attachments contained in this electronic
communication are legally privileged and confidential information, subject to the
attorney-client privilege and intended only for the use of the intended recipients. If the
reader of this message is not an intended recipient, you are hereby notified that any
review, use, dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please notify us immediately
of the error by return e-mail and please permanently remove any copies of this message
from your system and do not retain any copies, whether in electronic or physical form or
otherwise.

Thank you.


Rogers Towers, P.A.  (904) 398-3911

**Subject:** RE: CuttingEdgePreliminaryExpertReport_Swanson.pdf
**From:** "Rich Vermut" <RVermut@rtlaw.com>
**Date:** Fri, 2 Jun 2006 08:52:29 -0400
**To:** "Kendal Sheets" <ken@zitotlp.com>, "Joseph J. Zito" <joe@zitotlp.com>
**CC:** "Jim Middleton" <JMiddleton@rtlaw.com>

Kendal and Joe:

We have talked about Defendants' outstanding discovery requests on the
phone several times.  Cutting Edge has not responded to a single
discovery request or complied with the Case Management Report.  You have
also waived all objections to the discovery responses by not serving
responses.  We have also asked you on several occasions for deposition
dates for your witnesses. We would like to depose William Sykes, Matt
Pasulka, the corporate representative of Cutting Edge Technologies, Inc.
(in Jacksonville in accordance with the local rules), corporate
representative of Accelerated Steel Removal, Inc. and corporate
representative of Competitive Technologies, Inc.

We will be filing a motion to compel next week if we do not have your
responses on Monday.  Please let me know if you consent to that motion
pursuant to Local Rule 3.01(g).  We must state whether or not you
consent in the motion.

Thanks,

Rich


Richard S. Vermut
Rogers Towers, P.A.
1301 Riverplace Boulevard
Suite 1500
Jacksonville, Florida 32207
(904) 346-5573
(904) 396-0663 (fax)
RVermut@rtlaw.com




-----Original Message-----
From: Kendal Sheets [mailto:ken@zitotlp.com]
Sent: Thursday, June 01, 2006 6:49 PM
To: Rich Vermut; Jim Middleton
Cc: Joseph J. Zito
Subject: CuttingEdgePreliminaryExpertReport_Swanson.pdf

Rich & Jim,

I have attached the Expert Report for Mr. Swanson, CET's financial
expert.

regards,

Ken


TAX ADVICE DISCLOSURE: Pursuant to the requirements of Internal Revenue Service Circular
230, we advise you that any federal tax advice contained in this communication (including
any attachments) is not intended or written to be used, and cannot be used, for the
purpose of: (1) avoiding penalties that may be imposed under the Internal Revenue Code or
(2) promoting, marketing or recommending to another party any transaction or matter
addressed in this communication.

CONFIDENTIALITY NOTICE: The information and all attachments contained in this electronic communication are legally privileged and confidential information, subject to the attorney-client privilege and intended only for the use of the intended recipients. If the reader of this message is not an intended recipient, you are hereby notified that any review, use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately of the error by return e-mail and please permanently remove any copies of this message from your system and do not retain any copies, whether in electronic or physical form or otherwise.

Thank you.


Rogers Towers, P.A.  (904) 398-3911



A Technology Law Practice

26005 RIDGE ROAD, SUITE 203
DAMASCUS, MARYLAND 20872

www.zitotlp.com

Voice (301) 601-5010
Fax   (301) 576-3531

Washington, DC
Damascus, Maryland

June 10,  2006

Richard Vermut
James Middleton
Rogers Towers, P.A.
1301 Riverplace Boulevard
Suite 1500
Jacksonville, Florida 32207

      Re:    Cutting Edge v. North Florida Shipyards and Berman Bros
            JSO - 041

Dear Rich and Jim:

I am trying very hard to understand your position in this matter.  On the 2nd of June, I received two completely contradictory e-mails from you.  One questioning why your client had to spend $15,000 on attorney's fees and a second insisting that your client NFS spend even more money on your firm for conducting discovery when we had already sent you a signed stipulated dismissal.  These two e-mails were sent only eight (8) minutes apart.  One at 8:52 am the other at 9:00 am on June 2nd.

You asked why your client had to spend $15,000 in legal fees.  I cannot explain why you insisted on stretching this litigation out eight extra months.  I repeatedly asked for a meeting last summer and last fall.  You ignored my requests, and my renewed requests this past January.  Only after I told you that I had three trial matters which would consume all of my time in February - April and only after the discovery deadlines were in place and after several heated telephone calls from me, only then did you agree to have a meeting.  No matter how much I would like to avoid considering this possibility,  I can only surmise from your actions, that the answer to your question is that you wanted to have some additional billing

I told you before that if you wanted to accomplish a resolution you would have to have the meeting with me.  The only attorney available for the March 3 meeting, a date caused by your delay, was Mr. Sheets.   You were not candid and were evasive with Mr. Sheets.  You took advantage of his inexperience.  Contrary to your assertion, I insisted on access to many things in addition to those to which Mr. Sheets was allowed access.  Mr. Sheets and Mr. Pasulka did not inspect any ships and they were not allowed to discuss cutting issues with actual burners who were performing tasks on an actual ship.

Mr. Vermut and Mr. Middleton.                                                  ZITO *tlp*
June 10, 2006
Page - 2 -

       We continue to firmly believe that North Florida Shipyards has infringed on the patent in
suit.  We have a sworn affidavit from Mr. Sykes testifying to infringing activity that he
witnessed.  We have discussed this matter at great length with our technical expert and he is
convinced that the patent is valid and infringed by North Florida Shipyards based not only on the
testimony of Mr. Sykes and the photo graphic and video evidence obtained by Mr. Pasulka but
also based upon a review of your interpretation of the patent and the activities of NFS.

       I do not understand why your client NFS would prefer to continue to spend money on
this litigation and eventually have to pay damages to CET.   I do not understand why NFS does
not agree to the dismissal.  Based upon your insistence that the NSF dismissal be tied to the
Berman Bros. settlement, I can again only come to another unfortunate conclusion, you do not
see the direct conflict of interest created if you tie your two clients fate together.  The
accusations of infringement against NFS are completely separate and distinct from the
accusations of infringement against Berman Bros.   A resolution of one claim has no effect on
the other.  It is your responsibility as counsel to represent the interests of your client NFS
separate and apart from the interests of you other client Berman Bros.  There is nothing to be
gained for NFS from staying in the suit and paying legal fees waiting for a settlement with
Berman Bros.

       Turning now to your motion to compel.  We agreed that the discovery was not necessary
because we had sent you a signed dismissal.  This is why you have not sent us any of the
documents which I marked during the document inspection in May, despite the fact that I have
also payed your copy service for copying and bates numbering the documents marked.   These
documents are in your possession and should be provided to us immediately, if the case is
moving forward as you seem to prefer (I hope that you have checked with your client NSF to
determine if this is also their preference).   Further, your assertion that we have not provided any
discovery is disingenuous we have provided you with photos and video.

       Because you have refused to finalize the agreement we had previously reached, this case
will continue.  Enclosed with the confirmation copy of this letter, we are providing discovery
responses.  Some of the documents will be sent on June 12, with additional documents to follow.

       I believe that your insistence on spending your client's money on discovery after having
received a signed dismissal is improper and indicates a conflict of interest.  If you do not
withdraw the motion, we will have to bring this matter to the attention of the Court.


                                   Sincerely,


                                   Joseph J. Zito